UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
Northern Division

| | |
|---|---|
| COLLIN TOKOSCH ) <br> 201 Presidents Court ) <br> Berlin, Maryland 21811 ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> COMMUNITY BRANDS ) <br> PARENT CO., LLC ) <br> 14488 Old Stage Road ) <br> Lenoir City, TN  37772 ) <br> ) <br> SERVE: Registered Agent ) <br> The Corporation Trust Company ) <br> 1209 Orange Street ) <br> Wilmington, Delaware 19801 ) <br> ) <br> and ) <br> ) <br> CORE-APPS, LLC ) <br> 7 St. Paul St. ) <br> Baltimore, MD 21202 ) <br> ) <br> SERVE:  Registered Agent ) <br> The Corporation Trust Inc. ) <br> 2405 York Road ) <br> Suite 201 ) <br> Luitherville-Timonium, MD  21903 ) <br> ) <br> Defendants. ) <br> ) | Civil Action No. 1:21-cv-00305-SAG <br><br> **Amended Complaint** <br><br> Jury Trial Demanded |

## AMENDED COMPLAINT

Collin Tokosch ("Plaintiff") by and through his attorney, states the following in support of his Complaint against Community Brands Parent Co., LLC ("Community Brands") and Core-Apps, LLC ("Core-Apps"), collectively, "Defendants":

1

## PARTIES

1. Plaintiff, Collin Tokosch, is an individual residing in the Town of Berlin, situated in Worcester County, Maryland.

2. Community Brands Parent Co., LLC, is a Delaware Limited Liability Company, which, upon information and belief, maintains its primary offices in Lenoir City, Tennessee.

3. Core-Apps, LLC, is a Maryland Limited Liability Company, which, upon information and belief, has one member, Community Brands Intermediate, LLC. Upon information and belief Community Brands Intermediate, LLC is incorporated in Delaware and has its principal place of business in Delaware.

## JURISDICTION AND VENUE

4. Plaintiff brings this action for damages under Maryland's Wage Payment and Collection Law (Md. Labor and Employment §§ 3-501 to 3-509) for unpaid wages. In the alternative, Plaintiff also brings claims for breach of contract or equitable relief for unjust enrichment. The Court has jurisdiction over this matter under 28 U.S.C. § 1332, as the result of removal proceedings initiated by Community Brands.

5. Venue properly rests in this judicial District pursuant to 28 U.S.C. § 1446(a) because Defendant Community Brands removed this case from the Circuit Court for Worcester County, Maryland, which is within this District.

## FACTS COMMON TO ALL COUNTS

6. On or about June 27, 2011, Plaintiff was hired as an outside sales representative by Core-Apps LLC ("Core-Apps"). Core-Apps sold software applications ("apps") to organizations that run trade shows or other large events. The apps run on mobile devices and helped event

visitors navigate the event venue and also receive and share information with the event organizers, vendors, presenters, and other participants.

7. Core-Apps was at one time, headquartered in Arnold, Maryland but had a distributed workforce, meaning that its employees worked from their homes. At all times relevant to this Complaint, Plaintiff worked out of his home in the Town of Berlin except when he visited current and potential customers.

8. As a Core-Apps employee Plaintiff had an arrangement with his employer that he would be paid commission at either 5% or 7% of the contract price for each deal he secured. Core-Apps incentivized Plaintiff and other sales representatives to close multi-year deals. Accordingly, when Plaintiff closed a new or multi-year deal, his commission would be 7% of the contract price. When he closed a deal for a single year renewal, the commission payable was 5% of the contract price. Under this plan, Plaintiff earned each commission upon invoicing a customer based on a signed agreement delivered to Core-Apps. Commissions became payable when Core-Apps received payment from the customer on the contract.

9. The Core-Apps plan also provided for a base salary in addition to commissions. During his tenure with the company (including time spent as an employee of the Defendant and the company's prior ownership), Plaintiff's total annual compensation consisted approximately of one-third base salary and two-thirds commission.

10. As Plaintiff learned the business, he became very successful. He took quickly to the business and became the leading sales representative for the company.

11. It was not unusual for Plaintiff to secure multi-year contracts with Core-Apps customers who held trade shows or events annually. Plaintiff's arrangement with Core-Apps provided that he would receive commission on the amount a customer would pay each year, and

he would receive commissions on customer payments for future years if a customer extended or renewed a contract that Plaintiff had closed.

12. On or about March 15, 2019, Core-Apps was acquired by Community Brands. After the acquisition of Core-Apps, upon information and belief, Core-Apps's business was operated by Community Brands under the brand "Community Brands Event Tech Group." Defendants retained Plaintiff as an employee in his position as outside sales representative as of the date of the Core-Apps acquisition.

13. The Core-Apps plan in effect at the time of Community Brands's acquisition of the company was signed by the Core-Apps's Vice President of Sales on August 31, 2018 and by Plaintiff on September 18, 2018. Following the acquisition, Defendants continued to pay Plaintiff his earned commissions in accordance with the Core-Apps compensation plan throughout the remainder of calendar year 2019.

14. Defendants unilaterally tried to change the compensation plan in January of 2020. Defendants withheld commission payments owed to Plaintiff for deals he had closed as a Core-Apps employee in 2019 and earlier.

15. Plaintiff questioned Core-App's Vice President of Sales, Michael Candela, why commissions that he had earned and were payable to him were not being paid. Mr. Candela told Plaintiff that Community Brands was in the process of developing a new compensation plan for the company's sales representatives.

16. On February 17, 2020, Defendants presented Plaintiff with a new proposed compensation plan. The proposed plan, titled "Community Brands Sales Incentive Policies and Plan CY2020," included a provision making the plan effective retroactively to January 1, 2020 and through December 31, 2020. It contained an integration clause announcing that the plan

"supersedes and replaces all other previous plans, understandings or agreements, whether written or oral, with respect to a Participant's eligibility to receive commissions from the Company."

17. The proposed plan also contained language indicating the Participant's (the sales representative) consent to a lengthy reservation of rights clause which permitted Defendants "in [their] sole, exclusive and absolute discretion to: … make equitable adjustments to Commissions (whether commissions, bonuses, or otherwise) to address any extraordinary sales/windfalls before the commissions otherwise are earned; and/or to recoup or chargeback overpayments through adjustments to commissions payments, or reduction of regular base pay."

18. Defendants included a section titled "Quota" in the proposed plan. Under this section, Defendants established that "[c]ommissions are calculated based on the Participant's achievement of their assigned targets (Quotas), which are assigned to their Territory or Brand. It further provided, "The Company reserves the right to adjust a Participant's quota and/or deck of accounts, in its sole discretion." And it warned Participants, "failure to achieve quota may result in disciplinary action up to and including immediate termination of employment, with or without prior notice."

19. The quota described in Defendants' proposed plan would change Plaintiff's commission payments significantly. Under the proposed plan, Plaintiff would not receive any commission payments for contract renewals until he reached a retention threshold that equaled 75% of his quota. Once the first milestone was reached, Plaintiff could be paid half (50%) of the proposed incentive with additional milestones for reaching between 75% and 80% of his quota. Once Plaintiff reached 80% of his quota, he was entitled to payouts at 100% of the agreed rate of commission.

20. The proposed plan also established a "Commission Committee" which was empowered to "review[] and approve[] the individual Commission payments." After conducting such a review, the Commission Committee had the "discretion to refrain from approving Commission payments to participants who may attain or exceed their quota but have otherwise failed to perform satisfactorily or to manage in a correct and efficient manner." Under the proposed plan, a Participant could dispute the Commission Committee's decision not to pay a commission, but this had to be done in a writing to the same Committee that made the original decision, with no further appeal within the organization.

21. In addition to these changes to Plaintiff's existing compensation structure, the proposed plan put forward a new definition of "contract renewal," which would eliminate Plaintiff's right to commissions on the majority the renewal contracts for which he already earned compensation, including those commissions that Defendants were withholding at that time. It also permitted Defendants to chargeback and cancel commissions paid under a variety of circumstances.

22. Plaintiff understood that the proposed plan would give Defendants the ability to refuse to pay commissions for work that Plaintiff had already fully performed, had been invoiced, and in some cases, for which Defendants had already received payment.

23. Therefore, Plaintiff did not sign the proposed plan, and he requested a meeting to address the issue of his earned commissions in order to reach an understanding with Defendants.

24. Within a few days of receiving the proposed plan, Plaintiff met by phone with Mr. Candela and his immediate supervisor, Wayne Crawford. When Plaintiff raised his concerns and objections to the proposed plan, Mr. Candela stated that if Plaintiff continued to have issues with the plan, he [Candela] would see that it was handled "man to man."

25. Plaintiff understood Candela's closing remark to be a physical threat against him.

26. On April 7, 2020, Plaintiff, Mr. Crawford, and Mr. Candela met again to continue the discussion of the proposed compensation plan.

27. In that meeting, Mr. Candela reiterated his threat against the Plaintiff.

28. Defendants notified Plaintiff on April 9, 2020 that the company had terminated his employment.

29. Defendants offered Plaintiff a separation agreement which provided for two weeks of severance in exchange for Plaintiff's release of all claims against it, which would have included any claim for unpaid commissions.

30. Plaintiff did not sign the separation agreement or release his claims against Defendants.

31. After terminating Plaintiff's employment, Defendants created and distributed a report indicating the amounts invoiced to and paid by Plaintiff's customers. (**Exhibit 1**, Incentive Statement for Collin Tokosch).

32. According to Defendants' data, as of March 31, 2020, Plaintiff earned commission payments in the amount of at least $10,251.59, which was immediately due. *Id.*

33. Defendants created and distributed another spreadsheet which showed that Plaintiff earned at least an additional $82,825.20 in commissions for work he performed on 184 other customer accounts, many of which were multi-year deals for which he had earned a commission rate of 7%. (**Exhibit 2**, Spreadsheet of Opportunity Accounts).

34. Of those 184 accounts, the Defendants' data indicated that as many as 77 customers had paid their invoices as of March 31, 2020. *Id.*

7

35. Upon information and belief, Defendants continued to collect payments from these accounts since March 31, 2020.

36. In total, Defendants owe Plaintiff at least $93,076.79.

37. Plaintiff, through counsel, demanded payment for all unpaid commissions from Community Brands on June 10, 2020. The demand letter included as attachments the data Plaintiff had relied on when calculating the unearned commissions. Those attachments include Exhibits 1 and 2, attached hereto.

38. Counsel for Community Brands responded on July 13, 2020, refusing to pay any commissions.

39. On July 31, 2020 Counsel for Plaintiff responded to Community Brands July 13, 2020 letter, reiterating statements from the original demand that put Defendants on notice of its obligations under Maryland Wage Payment and Collection Law.

40. Counsel for Plaintiff provided Defendants yet another opportunity to satisfy its obligations to Plaintiff in an October 13, 2020 demand letter.

41. To date, Defendants have not remitted payment to Plaintiff for his earned commissions.

### COUNT I: FAILURE TO PAY EARNED COMMISSIONS

42. Plaintiff incorporates the preceding paragraphs 1-40 as if they were fully set forth herein.

43. As an outside sales representative for Defendants, Plaintiff performed all the required services for numerous customer accounts, such services included identifying opportunities, preparing price quotes, negotiating and delivering binding agreements to purchase the company's software and services that were executed by the customer. At various times during his

8

employment, Plaintiff was requested to send out invoices prepared by the company's finance department.

44. Having performed these services, Plaintiff is entitled to be paid commissions pursuant to his agreement and consistent with the past practices of Defendants.

45. Defendants have not only failed to keep their end of the bargain by paying commissions, but they also sought to intimidate Plaintiff into agreeing to forgo his right to payment. When that attempt failed, Defendants attempted to unilaterally modify the Plaintiff's payment arrangement. When Plaintiff questioned management about this, they summarily terminated him.

46. Despite their own records clearly indicting commissions are owed to Plaintiff, Defendants have steadfastly denied having any duty to pay commissions to Plaintiff, thus subjecting him to undue delay and costly litigation in order to recover what he is owed.

47. The Maryland Wage Payment and Collection Law ("MWPCL") (Md. Labor and Employment § 3-507.2) authorizes an employee to bring an action for unpaid wages against his employer when more than two weeks have elapsed since from the date on which the employer is required to have paid the wages.

48. Both Defendants were Plaintiff's employer, either by agreement, as the result of an actual or de facto merger, or because Core-Apps operates as an alter ego of Community Brands.

49. Community Brands informed Plaintiff in Discovery related to this lawsuit that Core-Apps employed Plaintiff.

50. However, Community Brands also acted as Plaintiff's employer.

51. Community Brands identified itself as Plaintiff's employer on paystubs and other payroll records.

9

52. Plaintiff's commission reports came from Community Brands.

53. Plaintiff was given a Community Brands email address to use for company business.

54. Plaintiff routinely reported to supervisors who identified themselves as Community Brands employees.

55. The Incentive Statement at Exhibit 1 to this Amended Complaint is branded with a Community Brands logo, indicating that Community Brands tracked Plaintiff's sales and commissions, including Plaintiff's progress towards meeting quotas;

56. Community Brands terminated Plaintiff and attempted to get him to sign a Community Brands severance plan.

57. Community Brands sought to control the terms of Plaintiff's employment by, among other things, demanding that he sign the Community Brands Sales Incentive Policies and Plan CY2020." That plan sought to "reward specified Community Brands sales personnel." And "commission payments under [the] Plan [were] directed and funded by Community Brands."

58. The plan further provided that "Community Brands reserves the right to unilaterally revise, suspend, revoke, terminate, or change any of its policies, in whole or in part whether described within this Plan in its sole discretion." In other words, Community Brands sought complete control over the terms of Plaintiff's compensation.

59. Defendants' failure to pay Plaintiff's earned commissions has extended far beyond the MWPCL's two-week threshold.

60. The MWCPL provides that when an employer's failure to pay wages is not the result of bona fide dispute, the court may award the employee an amount not exceeding three times the back wages, and reasonable attorney's fees and other costs.

61. On June 10, 2020, Plaintiff, through counsel, notified Defendants that he is owed him wages, and he provided the legal and factual justification for his entitlement to those wages.

62. Defendants have not articulated any legally justifiable basis for withholding those wages. Thus, there is no bona fide dispute with regard to whether Plaintiff is entitled to payment.

WHEREFORE, Plaintiff seeks judgement and an award for treble damages caused by Defendants' failure to pay Plaintiff's commission in an amount currently estimated at Ninety Three Thousand Seventy-Six Dollars and Seventy-Nine cents ($93,076.79), plus punitive damages, attorney's fees and costs and such other relief as the Court deems proper.

## COUNT II: BREACH OF CONTRACT

63. Plaintiff incorporates the preceding paragraphs 1-50 as if they were fully set forth herein.

64. Plaintiff and Core-Apps entered an enforceable contract wherein Core-Apps agreed to pay Plaintiff commissions for every new deal he closed and also for customer payments in future years if the customer extended or renewed a contract that Plaintiff had closed.

65. When Community Brands purchased Core-Apps, it did so subject to Core-Apps's contract with Plaintiff.

66. Defendants breached their contract with Plaintiff when they refused to pay Plaintiff the Commissions he had rightfully earned.

67. Defendants' breach damaged Plaintiff by depriving him of $93,076.79 in commissions he is owed pursuant to the contract.

WHEREFORE, Plaintiff seeks judgment for damages from Defendants' breach of contract in an amount currently estimated at Ninety-Three Thousand Seventy-Six Dollars and Seventy-Nine cents ($93,076.79), and such other relief as the Court deems proper.

## COUNT III: UNJUST ENRICHMENT

68. Plaintiff incorporates the preceding paragraphs 1-55 as if they were fully set forth herein.

69. Plaintiff performed work as a sales representative expecting to be compensated fairly according the reasonable expectations established by his employer and according to the employer's past practices. Through the performance of this work Plaintiff conferred a benefit upon Defendants.

70. At all times relevant to the performance of Plaintiff's work Defendants were aware of Plaintiff's activities and readily accepted the customer contracts that he delivered.

71. Defendants' failure to compensate Plaintiff for his efforts under the circumstances described herein make it inequitable for Defendants to retain the benefit of the business generated by Plaintiff without payment to him for the value conferred.

72. When Defendants proposed changing Plaintiff's compensation plan retroactively to January 1, 2020, Plaintiff raised several objections about the proposed changes. Defendants and Plaintiff engaged in an extended dialog on this subject which culminated in Defendants' termination of Plaintiff on April 9, 2020.

73. Prior to his termination Plaintiff believed that Defendants would continue to negotiate any changes to his compensation in good faith, therefore he continued to work and obtain business for Defendants while he waited for a resolution of the issues he raised with Defendants about their proposed changes.

74. After terminating Plaintiff, Defendants denied that they owed him any commission payments because he was no longer an employee of Defendants.

75. Plaintiff did not receive any commission payments from Defendants in calendar year 2020.

WHEREFORE, Plaintiff seeks judgment for damages from Defendants' unjust enrichment in an amount currently estimated at Ninety-Three Thousand Seventy-Six Dollars and Seventy-Nine cents ($93,076.79), and such other relief as the Court deems proper.

                                                              Respectfully Submitted,

                                                              Collin Tokosch
                                                              By Counsel

__/s/ Stephen T. Chema II_____
Stephen T. Chema II
Gombos Leyton, P.C.
11350 Random Hills Road, Suite 400
Fairfax, Virginia 22030
703-934-2660/9840 (facsimile)
stchema@glpclaw.com
Counsel for Plaintiff